## The Moline Water Power Company
### v.
### Waters et al.

1. CONTRACT—COVENANTS RUNNING WITH THE LAND.—The dispute arose upon the construction of a contract or covenant by appellant to furnish water sufficient to run appellees' mill. There was a clause providing that in case of the stoppage of water from any cause, the grantor should be "subject to the same usage in regard to the payment of rent during such stoppage as shall be adopted" between them and other parties renting power, etc. *Held*, that such covenant did not cover a claim for damages arising from the violation of a covenant by the grantor to "use due diligence in furnishing water," as agreed, and a deduction of rent for a period when the water failed did not estop the grantees from claiming damages for a failure to comply with the latter covenant.

2. COVENANT TO USE DUE DILIGENCE IN PROVIDING WATER.—The water power, by reason of an accumulation of mud through the inlet into the pool, ceased to furnish as much water as formerly, and became in a measure valueless. To remove this mud would require a long time and an enormous expenditure of money, far beyond the benefits derived from it by appellant.

It appeared also, that the land controlling this inlet had been ceded to the United States government, which had agreed to maintain the power out of appropriations that might be made, and which had entire control over the power. *Held*, that appellant's covenant, " to use due diligence in providing water," did not require it, at its own expense, to remove the accumulation of mud in the pool, but only to labor in good faith to procure the United States to maintain the power.

3. SETTLEMENT.—Where a party settles an account, about which there is a dispute, and gives his note for the amount settled upon, at the time saying that he understood it as a final settlement, he must abide by his agreement.

4. EASEMENT INDIVISIBLE.—The right to have the power used upon the lot conveyed to appellees was an indivisible easement, and all the owners of it should join in an action to enforce it, but it was not appurtenant to the whole lot; and appellees having sold a portion of the lot which had no connection with the power, their grantees were not necessary parties to this proceeding.

5. DAMAGES—PROBABLE PROFITS.—Where the action is for a breach of contract, and no special damages are alleged, none can be recovered. The loss of probable profits constitutes no part of the damages.

APPEAL from the Circuit Court of Rock Island county; the Hon. GEORGE H. PLEASANTS, Judge, presiding. Opinion filed February 24, 1882.

This suit was brought by appellant against appellees to recover on a promissory note given by appellees to appellant for the sum of $943.10, and also on an open account for use of certain water power of appellant, let to appellees and used by them for the purpose of propelling the machinery of appellees' mill. The declaration was filed August 24th, A. D. 1877, and plea of general issue was filed September 5th, 1877. The court granted leave to file additional pleas January 31st, 1878, and on May 2d, 1878, appellees filed two special pleas in substance as follows: 1st. Prior to July 1st, 1875, the appellees were partners in business, and possessed of a grist-mill at Moline which they operated in grinding grain for toll and selling flour, meal and other such goods, and had a large and valuable business and clientage, and that the mill had always been operated solely by water wheels, propelled by water power, possessed by appellant, which power before that time had been and then was sufficient to propel the said wheels, and the appellant before that time had agreed at all times to fur-

nish for said mill sufficient power to operate said wheels when it could be furnished by due diligence on its part; for the use of which power appellees agreed to pay to appellant $1,200 per annum in quarterly installments. For breach the appellees aver that the appellant did not use due diligence to furnish the power to appellees, but allowed mud and debris to accumulate in and about the pond so that sufficient water was not carried into the pond and to the wheels to operate them, and that thereby the wheels were stopped at various times for more than 200 days between July 1st, 1875, and the commencement of the suit; that had the appellant used due diligence in removing said mud and debris, the supply of water would have been ample to move said wheels and machinery during all the time; that by the stoppage of the mill appellees were deprived of gains and profits which they would otherwise have derived from the full enjoyment of the mill for said period of 200 days, by reason of which appellees' business was, and remains wholly destroyed, and they have lost their clientage and been unable to make tolls, or manufacture flour and such goods, and to make the profits therein to which they would have been entitled, and have lost the entire profits on their said business for two years last past, and claim damages in the sum of $3,000, which they offer to recoup and offset against appellant's demand.

The second plea was the same, except the claim of $10,000 damages. Upon leave of the court the appellees filed an additional special plea, January 9, 1879, which plea is in substance as follows, viz.: "Additional special plea of defendants, filed January 9, 1879, averring that plaintiff is indebted to defendants in the sum of $15,000; that plaintiff's cause of action is for water rents from defendants under a sealed agreement between plaintiff, and defendants Walter Waters and Joseph C. Blodgett, bearing date April 17, 1873, whereby plaintiff agreed with said Waters and Blodgett, their heirs and assigns, that it would at all times furnish them sufficient water power to run a 75-inch turbine wheel, whenever it could be done by the use of due diligence on its part, and that said agreement should be perpetual, and construed into a covenant running

with certain premises described; that afterwards, on January 26, 1874, said Blodgett conveyed to defendant Waters the undivided half of the premises described and covenants contained in said agreement; that on January 1st, 1875, defendant Waters conveyed to defendant First, the undivided half of the premises described and covenants contained in said agreement, and that plaintiff thereafter and until February, 1877, broke its covenants, in that it did not furnish defendant sufficient water to run a 75-inch turbine wheel; but from July 1st, 1876, to February 6, 1877, negligently allowed debris, mud and sand to remain and accumulate in and about the mill pond of said plaintiff above and abo it the place where the water was to be furnished defendants, which plaintiff by due diligence could have prevented and removed, by reason whereof the water for four hundred days, during the space of time last mentioned, was prevented from flowing to said place with sufficient head to move a 75-inch turbine water wheel.

" That defendants were, on the 1st of February, 1875, and before and afterward, and during the period said suits accrued, partners, and possessed of and did operate a grist-mill upon the premises aforesaid, in Moline, and carrying on the business of grinding grain for toll, and manufacturing and selling flour, etc., and had a large and lucrative business, and a valuable clientage, and said mill has always been operated solely by the water power of plaintiff; that by reason of plaintiff's negligence aforesaid, defendants were unable to carry on their business for more than 400 days of said period, and defendant's business was wholly lost and destroyed, and defendants suffered $15,000 damages."

Upon issue being joined, the cause was tried, and on Jan. 13, 1879, the jury found a verdict for appellees, and assessed their damages at $10,000, which was set aside by the court and a new trial granted. The case was again tried by a jury, and verdict for appellees for $10,970.22, June 19, 1879. The appellees having remitted $3,500, the court overruled appellant's motion for a new trial, and rendered judgment on the verdict against appellant for $7,470. The note in evidence was dated September 20, 1876, due 90 days after date, payable to appel-

M. W. P. Co. v. Waters.

lant *only*, with ten per cent. interest. The account appellant sued on is as follows:

Moline, August 17, 1877.

Messrs. WATERS AND FIRST,

In account with MOLINE WATER POWER COMPANY.

| | |
|---|---|
| To water rent, ending September 30 .............. | $300.00 |
| Interest to date ............................ | 26.42 |
| To water rent, ending December 31, 1875 ........ | 300.00 |
| Interest to date ............................ | 16.42 |
| To water rent, ending March 31, 1877............ | 300.00 |
| Interest to date ............................ | 8.92 |
| To water rent, June 30, 1877................... | 300.00 |
| Interest to date ........................... | 8.92 |
| | · $1,255.68 |

The copy of the account of appellant, which the note was given to balance, is as follows, viz.:

[COPY.]

Moline, Ill., September 20, 1876.

WATERS AND FIRST,

1875. To the MOLINE WATER POWER Co., Dr.

Ap'l 1. To water rent, from Jan'y 1st, '75, to date, @ $1,000 per year................... $250.00

Cr. by allowance of ½ for low water ...... 125.00 $125.00

July 1. To water rent from Ap'l 1st, '75, to date, $1,000 per year........................... $250.00

1876.

Jan. 1. To ½ year's water rent, to date, from July 1st, '75, @ $1,000 per year.............$500.00

Cr. by allowance for 75 days low water... 207.75 292.00

July 1. To water rent ½ year, to date, from Jan. 1st, 1876, at $1,200 per year, as per agreement for two wheels for 2 years ................... 600.00

$1,267.25

By discount for not beginning to use second wheel until Jan. 18, '76, as per Waters & F.'s mem. on their day-book.............................. $10.45

By allowance for 5 days low water, from Jan. 1st to.

Jan. 19, '76, while running under old agreement
for one wheel, and allowance for low water, to be
made same as to other water renters . . . . . . . . . . .     13.70
By cash this day (Sept. 20, '76) . . . . . . . . . . . . . . . .     300.00
By Waters & First's note, 90 days . . . . . . . . . . . . . .     943.10

                                                                    $1,267.25

Settled as above.

MOLINE WATER POWER COMPANY,

By J. W. ATKINSON.

The testimony showed a warranty deed from appellant to
Walter Waters and Jos. C. Blodgett dated April 17, 1873, con-
sideration $7,260, conveying the mill premises situate opposite
the double opening in the water power wall first west of the
single opening, subject to the covenants and conditions of
article of agreement bearing even date with deed made between
the grantor and grantees, which is to be perpetual and at all
times construed as a covenant running with the land conveyed.
The written agreement is referred to in the deed. The appellees
in the agreement bound themselves to lease from the appellants
sufficient water to run a seventy-five inch turbine water wheel,
and pay therefor an annual rent of $1,000, till first day of
August, 1877, etc. etc. The rent to be paid quarterly at the
end of each quarter. The appellant covenanted on its part
with appellees, their heirs and assigns, that it will at all times
furnish said parties of the first part (appellees), their heirs or
assigns, the amount of water hereinbefore designated, whenever
the same can be so furnished by using due diligence on its part.

The appellees had by the agreement the right to put in a
second water wheel beside the 75-inch turbine wheel of the
Nasen pattern that they had in, provided they elected to do so
prior to Nov. 20th, A. D. 1874, at a stipulated rent; but they
did not elect to put it in.

It was further agreed that in case of the stoppage of water,
for any cause, " the said parties of the first part shall be sub-
ject to the same usage in regard to the payment of rent during
such stoppage, as shall be adopted between the said Moline
Water Power Co. and other parties renting power from it, and
in case of the destruction of the mill on said premises by fire,

water rent shall cease for a reasonable time for rebuilding the same." And it was provided that the appellant "shall have a valid and first lien upon the aforesaid premises, as security for the payment of judgment or judgments, decree or decrees, which shall or may be recovered in its favor, its successor or assigns, for any breach or violation of any of the covenants or agreements contained in this instrument, and the said premises shall be alone liable therefor. The agreement shall be perpetual, and at all times construed into a covenant running within the land herein before described." There was a quit-claim deed from Joseph C. Blodgett and wife to Walter Waters, for all his interest in the premises described in the deed from appellant to Waters and Blodgett.

There was also a quit-claim deed for an undivided half of the same premises, dated October 19, 1875, from Walter Waters and wife to James First, one of the appellees, consideration $5,000, except a portion off one side of the mill lot not including the mill or any portion on which the power was used which Walter Waters and wife had before that time conveyed to Deere & Co., who still owned and possessed the same. The mill fronted on Main street in Moline and was built on the tail race on the north end of the lot pretty nearly in the middle east and west; the lot was wider at the race than at the front; the mill used water power, which was obtained from the stone wall in the front of the mill; the wheel was placed by the wall and the power was carried across the tail race by a wire cable. The water power was obtained by means of improvements made by the Government of the United States in the Mississippi river opposite the city of Moline. The improvement consisted of the formation of a body of water called a pool, created by means of a weir or stone dam commencing at the foot of the wagon bridge leading from the Illinois shore to the island in the river, thence running diagonally towards the island, down stream some distance, and finally connecting the main land by means of the dam, with the island of Rock Island, that portion of the river between the mill and the island constituting the pool, and that portion between the wall and the main land the tail race. The following is a correct plat of the mill property and the surrounding.

U. S. Island.

Pool.

Tail Race.

Wagon Bridge.

Mill Lot.

A

C   B

Moline City.

"A," Original Lot.
"B," Portion sold to
Deer & Co.

On the 20th August, 1867, the appellant had conveyed to the United States in fee as appears by the contract in evidence under authority of joint resolution of Congress of March 28, 1867, "their entire water power with the free and unrestricted use of so much of the bed of the Mississippi river as may be required for the further development of the power" which development with its maintenance is to be done by the United States out of the appropriations applicable to the same. By the same contract the United States granted to appellees, "the right of the free use of one-fourth of the power, etc. etc." There was a supplement to the contract not affecting the questions here involved, dated April 8th, 1862. By the contract, the report of commissioner which is made a part of the original contract as pertains to what was granted, is as follows:

1st. The company (appellant) conveyed to the United States the fee of the entire Moline water power, and was to grant to the United States the unrestricted use in perpetuity without charge of so much of the bed of the river not belonging to the United States as may be covered by the pool and wall, and ten feet outside of same wall, etc. etc.

2nd. United States to develop and maintain the power so far as it can be done with the money heretofore appropriated, and that which may hereafter be appropriated by Congress.

3rd. Appellants to have use in perpetuity free from all charge for rent or repairs of one-fourth of the entire power developed, etc. "Provided that the grant by the company to the United States shall not be construed to operate as a bar to the free use and occupancy by the company, its lessees or its assigns of the same premises for all purposes incidental to the use of their portion of the power, and such use shall not interfere with or obstruct the United States in the free use of its portion of its powers."

Mr. Charles Dunham, Mr. Walter J. Entrikin, and Mr. Robert T. McNeal, for appellant; that appellees being tenants in common of a part only of the land to which the original covenant attached, can not maintain a joint action or set-off on that covenant, cited Story on Partnership, 92; Coles v. Coles, 15 Johns. 160; Fisher v. Eslaman, 68 Ill. 78; Murray

v. Haverty, 70 Ill. 318; 4 Kent's Com. *367; Barbour on Parties, 32; Chitty's Pl. 65; Bacon's Abr. "Joint Tenants;" Taylor on Landlord & Tenant, § 569; Washburn on Easements, 85; 1 Washburn on Real Property, *421; Rawle on Covenants, 533; Stevenson v. Cofferin, 20 N. H. 150; Daniels v. Daniels, 7 Mass. 135; Rehoboth v. Hunt, 1 Pick. 224; May v. Parker, 12 Pick. 34; Gilmore v. Miller, 12 Pick. 120; Bronson v. Coffin, 108 Mass. 175; Witherbee v. Burnett, 2 Allen, 428; Baker v. Jewell, 6 Mass. 460; Clark v. Scudder, 6 Gray, 122; Sweet v. Patrick, 11 Me. 79; Van Horne v. Craine, 1 Paige's Ch. 455; Astor v. Miller, 2 Paige's Ch. 78; Norman v. Wells, 17 Wend. 136; Kane v. Sanger, 14 Johns. 88; Law v. Mumford, 14 Johns. 427; Decker v. Livingstone, 15 Johns. 479; Van Rensselaer v. Bradley, 3 Denio, 135; Noonan v. Orton, 4 Wis. 335; Wooliscroft v. Norton, 15 Wis. 198; Samuels v. Blanchard, 25 Wis. 329; Lamb v. Danforth, 8 Am. Rep. 426.

The action is local and can be maintained only in the county where the land is: Rawle on Covenants, 533; Clark v. Scudder, 6 Gray, 122; Lienow v. Ellis, 6 Mass. 331.

A sealed instrument may be changed, abrogated or suspended by a subsequent parol agreement; Morril v. Colehour, 82 Ill. 18; Cooke v. Murphy, 70 Ill. 96; Browne on Statute of Frauds, § 429; Stephens v. Cooper, 1 Johns. Ch. 49.

The evidence must conform to the pleadings, and a recovery can be had only upon the particular breach assigned: The People v. Hunter, 89 Ill. 392; T. W. & W. Ry. Co. v. Beggs, 85 Ill. 80; Gridley v. Bloomington, 68 Ill. 47; Disbrow v. C. & N. W. R. R. Co., 70 Ill. 246; 1 Greenlf's Ev. § 66.

Special damages must be specially pleaded: Miles v. Weston, 60 Ill. 361; Johnson v. Von Kettler, 84 Ill. 315; Horne v. Sullivan, 83 Ill. 30; Adams v. Gardner, 78 Ill. 568; Olmstead v. Burke, 25 Ill. 86; 2 Greenlf's Ev. § 254; Wood's Mayne on Damages, *478; 1 Chitty's Pl. 376; Sedgwick on Damages, 575.

Against the remittitur: Loewenthal v. Streng, 90 Ill. 74; Cravett v. Mugge, 89 Ill. 218; Audd v. Wells, 11 Wis. 426; Cossine v. Delaney, 38 N. Y. 178; Thomas v. Wormack, 13 Tex. 580.

M. W. P. Co. v. Waters.

Messrs. OSBORN & CURTIS, and Messrs. SWEENEY, JACKSON & WALKER, for appellees; upon the right of appellees to recover for non-performance of the contract, cited Harrison v. Bingham, 2 Kern. 107; Bank of Ky. v. Adams Ex. Co. 3 Otto, 174.

Tenants in common may join in an action of covenant: Bac. Abr. "Joint Tenants;" Kitchen v. Buckley, 1 Lev. 109; Bradburn v. Batfield, 14 Mees. & W. 574; Wooliscraft v. Norton, 15 Wis. 198; Samuels v. Blanchard, 25 Wis. 329; May v. Parker, 12 Pick. 34; Daniels v. Daniels, 7 Mass. 136; Coryton v. Litheby, 2 Wm. Saund. 115.

Upon the right of set-off: Waterman on Set-off, § 206; Holbrook v. Lackey, 12 Met. 132.

LACEY, J. The main questions in this case arise on the construction of the contract or covenants running with the deed from appellant to appellee, Waters and Joseph C. Blodgett, to the latter of whose rights the appellee first succeeded by deed to an undivided half of the mill premises conveyed to him through Waters. There are some other questions not growing out of the covenants that we shall notice further on, but will now consider the questions involved in the covenants in the deed. The questions involved are two: 1. Was the covenant to furnish the water for the wheel in use at the time the deed was made, if the same could be done by appellant by using due diligence on its part, satisfied in case of failure to comply by deducting the rent for the time the water failed on account of such neglect? 2. What was the duty of appellant under its contract to furnish water "whenever the same could be so furnished by using due diligence on its part?" In order to understand the different claims as to the construction of the two provisions in the contract, it is necessary to refer somewhat to the testimony and what is claimed in regard to appellant's duties under the contract. The water power was created by water flowing from the Mississippi river through the inlet between the upper end of the island and the Illinois shore into this pool, and creating a head of water in the pool of from five to eight feet, according to the rise or the fall of the river, making a good power nearly all the time while the inlet or

mouth to the pool was not obstructed by ice, mud or some other material.

The wall was built in 1869, and till the fall of 1873 there was abundance of water for all the wheels, 12 to 15 in operation nearly all the time; but from that time the mud had accumulated in the mouth of the pool to such an extent from settling, on account of the water having no current, that the power began to fail for want of water. From that time on, the power grew more unreliable every year, as the sand and mud increased in the inlet, and in the pool itself, until at times in low water there would be no power at all. On account of this accumulation of deposit, the water failed to come into the pool fast enough to keep it full while the mills were running and letting out the water to propel the wheels. The water would not come in as fast as it was let out by use. Under the contract it is claimed that due diligence on the part of appellant required it to remove the deposits, and to keep the inlet to the pool clear, so there would be an abundant supply of water; and that the failure on the part of appellant to do its duty in this regard, was not satisfied by the abatement of rent for the time lost. We do not think that the words " that in case of stoppage of water for any cause, the said parties of the first part shall be subject to the same usage in regard to the payment of rent during such stoppage as shall be adopted between appellant and other parties renting power from it," means to cover damages arising from the violation of the covenant to use due diligence in furnishing the water as agreed. In other words, it is not an agreement to liquidate all damages that might arise for such violation in such mode as that which it appears from the evidence was to deduct rent for the actual time lost. To have such an effect, we think the language should be clear and explicit, and that appellant ought not to be relieved from payment of all damages arising from a willful violation of its covenants, by implication, or doubtful construction of language.

The law always implies damages from the violation of an agreement and sometimes such damages are serious and heavy. By the language of this claim, the " abatement of the rents".

seems to us not to refer to unliquidated damages. It does not seem to have been in contemplation of the parties that all unliquidated damages arising from willful or negligent violation of covenants should be called rent and be liquidated by the simple abatement of it. This could not have been the intention of the parties. Such a construction would render almost nugatory this claim in the covenant. The appellant's counsel in his opening brief says: " If appellant had refused to take action under this clause in his contract, and litigation had arisen between the parties as to what appellant should be required to do under it, there might have been some question as to its meaning," but it is contended that appellees by their conduct and dealing under it have given it an interpretation favorable to appellant's views. But this conduct may be referable to other motives, in which case no aid for construction could be obtained from the source, and the general and reasonable view would prevail.

The next question is, what did " due diligence in regard to cleaning out the mud from the inlet to the pool and keeping it clean," require of appellant ? Did it require it to clear out the mud and keep the pool in good order at a sacrifice far beyond its interest involved? If the words mean that it should use due diligence in removing whatever impediments stood in the way of furnishing the water, that is, remove them as fast as diligence would permit, it would be its duty to proceed without delay, if the United States did not object, and finish as soon as industry would allow, no difference at what cost or sacrifice, unless it was an impossibility. In such case, if the wall itself should wash out, it would have to be replaced as fast as due diligence would allow, although the United States would derive three-fourths of the benefit of its being rebuilt. The rocks in the inlet may have to be blasted. We can not think from the language used that such was the intention. It appears that the work necessary to be done in order to clear out the deposits at the head of the pond in order to benefit the water power, would be enormous. The testimony of Daniel Gordon, a surveyor and civil engineer, who was acquainted with the water power since 1843, and who made a thorough survey of it, and

whose testimony is not contradicted but corroborated, is that the deposits cover forty to fifty acres, are about twenty-six hundred feet long and about eight hundred to fourteen hundred feet wide, and over two feet deep on an average, and since its first measurement has increased in depth nearly one half foot. When he measured, there were 235.059 cubic yards of earth that would have to be removed in order to benefit the power. It would cost twenty-five cents per yard to remove it, and according to this calculation, about $76,000 to remove the deposits. Other witnesses put it at fifty to sixty thousand dollars. It would cost, as one witness states, eight thousand dollars per year to keep the deposits dredged out.

The government engineer estimates the cost of making the necessary improvements to furnish the water at $157,000. The entire income from water rents is not over $10,000 per year, and that is subject to some deduction on account of loss of water power through the blockade of ice and low water, even with the deposits removed. We think from the agreement with the government and deed of the appellant to it, the entire bed of the pool is in the government in fee.

The evidence also shows that it has full possession and control of the whole power. The only right appellant has is to the use of one-fourth of the water and such incidental rights as are necessary to its enjoyment.

It is insisted that appellant in order to furnish the water in exercising due diligence should ask of the government liberty to go in the pool and clean it out, and if it obtains such liberty, to do the work at whatever cost. If it does not show that it has tried to get such liberty, then it is guilty of a breach of his covenant. We can not sanction such claim. In the first place, it is not shown that any officer has power under any existing law to grant such license. Secondly, if such power existed, such license could only be granted at will, subject to be revoked at any time.

Thirdly, what security would appellant have after the deposits had been removed by it? It would not be prohibited from continuing the work necessary to be done in order to keep the pool clear, and thus it would lose the benefit of all it had done.

There is nothing shown by appellees to inform the court that appellant could get any permit from the United States that would be any security to it in the investment of its money. Nothing short of an act of Congress could be any security. The property was ceded under act of Congress, to the United States by appellant. It is contended by counsel for appellees that the appellant has a contract with the United States to the effect that the latter would keep the water power in a state of good perservation, and if the latter fails, the appellant could go on the premises, do the work and charge the government for it, and sue it and collect it. We do not understand that any suit can be brought against the government in any court, State or United States. Or that the United States would ever allow it to do the work with a view of such action. The contract with the government is that it " will develop and maintain the power so far as it can be done with the money heretofore appropriated, and that which may hereafter be appropriated for that purpose. If the money is never appropriated, what remedy is there for appellant?

What can the court of claims do? Nothing; for there is no appropriation out of which it can be paid. The act under which this right to the water power was acquired is not before us, but it is not probable that it gave any authority to bind Congress to make such appropriation. The power is to be maintained if Congress appropriate money. The appellee Waters and his co-grantee Blodgett knew, or were guilty of gross laches if they did not know at the time they received their deed, that the only right appellant had to the water power in question was the right to use a portion, and that right was obtained from the Government of the United States. They had lived there, and seen and known that the United States made all the improvements and had full possession and control, and can not be supposed to have been ignorant of the situation. The meaning of the contract where it is doubtful must be determined with reference to the situation of the parties and their rights and privileges existing at the time it was entered into, and a reasonable and natural construction should be given it—not a strained, arbitrary or harsh one. The appellant had a contract with the United States, that the latter,

which was the fee owner of all the real estate covered by the pool and wall, would keep the water power in good preservation out of the appropriations then made, and that thereafter might be made by Congress, and it had a right to expect that such appropriations would be made when necessary, but of this it could not be certain; Congress might never make any appropriations.

If Congress did not, then what position would it be in? It had no power to compel such appropriations, nor to regain the title to the water power which it had ceded away; nor could it enter upon the property belonging to the government to excavate and make repairs of any kind required either to rebuild the wall in case of destruction, or remove deposits from the mouth of the pool. No power existed in any of the officers of the government to grant such power, or at least to grant a permanent right to do such work. There could be no safety in doing any such work under a temporary permit, for it would be liable at any time to be interrupted and appellant driven off and subjected to the loss of all that had been done. The appellant would be interested in having the work kept in good repair and would of course do all it could in having the government keep it up.

Would the agents and owners of appellant be likely to make such a contract as is claimed by appellees to absolutely undertake to keep the inlet to the pool dredged, or even to do so by the consent of the agents of the government, and take all the chances and risks incident? We think no prudent man would make such a contract, and under the circumstances the grantees in the deed would not have been likely to ask it, knowing the situation of affairs. But if the water power were interrupted it would be no more than just that the rent should be abated for such time, and this would keep the appellant always interested in doing all it could to have the government keep up the power. Hence we find in the contract this provision: Appellant " covenants and agrees to and with the said parties of the first part (grantees) their heirs and assigns, that it will at all times furnish said parties, their heirs and assigns, the amount of water hereinbefore designated, whenever the same can be

furnished by using due diligence on its part." The words "on its part" we think clearly had reference to the situation of the appellant with regard to its contracts with the government. The government had all the rights and property in the water power and real estate covered by it, and appellant had nothing except the right to the use of a portion of the power. The United States had agreed to maintain the power out of appropriations made and that might be made by Congress. The words simply referred to this situation and the whole covenant meant that the appellant would do what it could to have the government carry out its agreement.

The appellant, we think, by this covenant did not undertake to repair the pool and furnish this water and power by using due diligence in any other way than to work and labor in good faith to procure the United States to maintain the power. The evidence shows that numerous efforts have been made in that direction, and we can not have much do ubt butthat appellant's agents have been earnest and sincere in their efforts to obtain government aid in the matter. At the time this contract was made it was probably not anticipated by the parties to it that any such trouble with the water power as has occurred would ever happen. It is contended that the words "on its part" contained in the covenant in question have no particular meaning, and that it would have meant the same without them. But it is the duty of courts to give force and effect to all the words in a contract when it can be done consistently with all its other provisions. And it appears to us under the light of the evidence that the words had a purpose and an appropriate place.

We have examined the evidence carefully and it appears to us that at the time the note was given for balance of account that the abatement of rent was settled up to the time the new contract, made January 1st, 1876, went into force. An abatement for all the time lost purported to be given in the account, and appellees had credit for it. This account was accepted and settled without any objection on the part of appellees, or without any claim for damages arising out of the alleged breach of covenant. Mr. Browning states that he told appellee First,

at the time the settlement was made, that if it was not to be considered a finality he would not make it, and appellee said he so understood it, and gave an explanation of why he put the word "only" after the payee's name in the note, that he wanted to know where to find it when he wanted to pay it. Appellee First claims that he had a mental reservation, that if he did not sell out to appellant, which he was trying then to do, or settle it, he would not pay the note. But if he settled the account and gave his note and agreed that it was a final settlement, his mental reservation that he might defend against it would not avail him. He must abide by his agreements no matter what his mental reservation was; therefore instruction number two given for appellees was calculated to mislead.

It is contended on the part of appellant that a new agreement was entered into by it with appellees on the 1st day of January, A. D. 1876, to the effect that the appellees were to have the right, and were to put in another wheel, a fifty-six inch Leffel wheel, and were to take their own risk of high and low water, and absolve appellant from the exercise of any diligence in regard to furnishing water, and were to pay for the two wheels $1,200 per annum without any abatement for stoppages or want of power, which agreement was to continue for two years, and that this was an entire substitution of a new contract for the covenants in the old. On the part of appellees, it is contended that the new contract was only a change of the old one in particulars, 1st, as to the amount of rent paid; 2nd, there was to be no abatement for stoppages, but it left in force the covenant in the deed and contract in regard to due diligence. This issue was presented to the jury, and the evidence was conflicting, and we will not undertake to say on which side the evidence preponderated; but if appellant should prove this new agreement as it claims, we think the effect would be to suspend the old contract so long as they occupied under the new one, if this new contract was made to settle a disputed liability on the covenants in the deed and contract. It appears that there was one-half year's rent, under the new arrangement, settled without deduction at the time the note was given, as is shown by the account, and was included in the note, amount-

ing to $600, without any abatement for stoppages of power during the time.

There are several objections taken by appellant to the action of the court in giving certain instructions for appellees, and refusing certain ones asked for by appellant, which we do not deem it necessary to examine in detail; suffice it to say, that the theory on which the court tried the case in regard to the meaning of the covenant of " due diligence " was opposed to the construction we have given it. The court below leaving to the jury to determine whether under all the circumstances the appellant was bound to dredge out the deposits in the pool provided the government's agents and officers would allow it, and that their finding should be based upon its reasonableness. The court also refused to give instructions based on the theory that the appellant was not bound to dredge the pool.

So far as the court gave or refused instruction contrary to the views we have expressed herein, it was error. The question has been raised by the appellant, that the covenant on its part to supply the water power to the grantees, in the deed conveying the mill lot created on easement, that was appurtenant to the whole estate, and that the grantees in the deed, having conveyed a portion of the lot (not including the mill and place where the easement was located and used) to Deere & Co.; that Deere & Co. became, by virtue of such deed, the assignee of an undivided portion of this easement. That the easement was indivisible in its nature, and therefore Deere & Co. should be joined in the suit to recover on the covenants. We are of opinion that the easement was indivisible, and that all the owners of it should join, but we are also of the opinion that the deed by Waters to Deere & Co. did not convey to the latter any interest in the same. The deed was to a portion of the lot on which this power never had been, and was not at the time, used and enjoyed. It was used and enjoyed by the grantees in the deed, at the time and afterwards, in the mill portion alone. The easement was of a personal, as well as of a real nature. The grantees had a right to have the power used on any portion of the lot they saw proper, but not

off of it.  They had established the power on a portion of it, and sold a portion that had no connection with it.

We think this easement was not appurtenant to the whole of the lot in such manner as to necessarily pass by the deed to Deere & Co.  It was not in the contemplation of the parties, and the court will not give such a construction to the deed. Nor could the grantees in the deed locate this power on their portion of the lot without his consent.  We deem the authorities cited by appellees conclusive on this question.  Washburn on Easements, Chap. 1, Sec. 3, 12, 13.  Kitchen & Knight v. Buckley, 1 Leving, 109.  Bacon's Abridgment, Joint Tenants, 73.  Braddon v. Batefield, 14 Mees. & Welsb. 574.  Woolescraft v. Norton, 15 Wis. 198.

We see no reason why the appellees can not sue in this cross-action of set-off against appellant, notwithstanding the appellees are sued as partners.  The claim of appellant, as well as of appellees, grew out of the same contract, and we can not see that they are partners in the one more than in the other. Even if that were so, we see no reason why the set-off could not be maintained in an action at law.  The point is made that the pleas of set-off are so drawn that evidence of the kind of damages claimed are not admissible. The pleas are drawn on the theory that the supposed profits of the milling business which might have been made in case the business had not been interrupted by failure of water power, were recoverable.  The evidence concerning such claim was very properly ruled out by the court.

We think the pleas were not so drawn as to admit the proof of the kind of damages sought to be recovered, or a large portion of them, viz.:  1.  The value of the services of appellees, services of head miller, or roustabout, man and team, interest of stock in trade, wheel and flume.  Such damages as these are not the necessary result of the loss of power and use of the mill; they accrue, if at all, on account of the special circumstances of the case, which should be set up in the plea, which may, under certain circumstances, be within the contemplation of the parties to the contract.  The averment that the use of the mill was lost might be sufficient under which to prove its rental value.

M. W. P. Co. v. Waters.

The rule, as stated in Olmstead v. Burk, 25 Ill. 86, is thus laid down: "In every case where the action is for breach of a contract and no special damages are stated in the declaration, as in this case, the plaintiff is confined in his recovery to such damages only as naturally arise from the breach complained of; but if the damages complained of do not naturally arise from that fact, they can not be recovered, unless they are particularly stated in the declaration, and not then if they are not approximate." 1 Chit. Pleadings, 395–6. The loss of probable profits constitutes no part of the damages. Taylor v. McGuire, 13 Missouri, 517.

It is claimed that the evidence was admitted by way of recoupment, and therefore admissible under the general issue. This might be true if the appellees did not seek to actually recover over on his pleas of set-off. This would be recovering part of the damages under one plea and part under another, in substance splitting up his cause of action, which was indivisible, and allowing the appellees to recover a portion of his damages under his plea of set-off, in which he has claimed to set out his whole cause of action and omitted certain damages, and allowing him to recover for those under a plea of general issue. We are of opinion that this is not proper; also that the recovery over alone on such plea from its amount must have contained part of the class of damages above claimed.

We think the court erred in not refusing the evidence, or at least in not granting a new trial. We regard the 9th instruction as erroneous. This instruction seems to make appellant liable for the expense of putting in a new wheel in case it recommended to appellees to put it in, and is as follows: 9. The jury are further instructed that if they believe from the evidence that the plaintiff did not use due diligence to provide water power, and in consequence thereof the water power partially failed, and that to avoid damages by partial failure, and in compliance with the recommendation of the officers of the Water Power Company, the defendants built a new flume, and put in another wheel, and that by reason of the continued neglect of the plaintiff regarding diligence, the expense so incurred by defendants was useless, and the benefit of such at-

tempt to avoid damages was wholly lost, or in part lost, to the defendants, by reason of such failure by the Water Power Company, then in that case the jury should find for the defendants such damages, whether partial or entire, which they have suffered by reason of putting in such second wheel." The contract was voluntarily entered into without any fraud or circumvention, and the expense of putting in the wheel incurred on appellees' own judgment, and therefore binding; if any loss accrued, it was the result of entering into such contract, and appellant should not be held responsible in case of failure for the expense of putting in the wheel. Such damages would be entirely too remote to recover under the breach, if any, of the old contract. The appellees might as well be allowed to recover the price of the building, the mill, as part of the damages, if it had been originally built in contemplation of the contract to furnish the water power. For the different errors above assigned, and because the court should have granted a new trial, the judgment of the court below is reversed and the cause remanded.

Reversed and remanded.

PLEASANTS, J., having tried the case in the court below, took no part in its decision here.